## Case No. 6,720.

### The HOTSPUR.

[3 Sawy. 194;[1] 7 Chi. Leg. News, 65.]

District Court, D. Oregon. Nov. 5, 1874.

RESCISSION OF SEAMAN'S CONTRACT — CONTRACT AND SERVICES OF MINOR—BRITISH SHIPPING ACT.

1. Where, on a voyage from Glasgow to Buenos Ayres, from thence to Portland, Or., and back to a port in the United Kingdom, the cook and steward, who is not a seaman, is disrated a few days out from B. A. on a charge of wasting provisions, and put before the mast, it amounts to a rescission of the contract by the master. and the steward may, when he arrives at Portland, accept such rescission, and claim his discharge; but what compensation, if any, he shall have for his services depends upon the particular circumstances of the case.

[Cited in The Mary C. Conery, 9 Fed. 223; The Topsy, 44 Fed. 634.]

2. A contract by a minor to serve as a seaman is a voidable one, and may be avoided by such minor at any time before its completion, and thereafter he is not bound by it in any manner, neither can he sue upon it for his services, but may recover the value of such services, allowing for any injury which the owners may sustain by reason of the avoidance of the contract.

[Cited in The Topsy, 44 Fed. 636.]

3. Where, under the British merchants shipping act of 1854 (17 & 18 Vict. c. 104), the duration of a voyage is described in the shipping articles as probably twelve months, a seaman signing the articles engages absolutely to make the voyage, whether the duration of it be more or less than that period, provided the master in good faith endeavors to accomplish the voyage within the time mentioned.

Suit for seaman's wages.

David Goodsell, for libellants.

William H. Effinger, for claimants.

DEADY, District Judge. The libellants, Thomas M. Stewart, John Brown, William McMasters, Lluelling Griffiths, Archibald Crawford, Charles Freund, and John McFarlane, on March 10, 1874, signed articles for a voyage on the British bark Hotspur, "from Glasgow to Buenos Ayres, and, or if required, to any port or ports in South America, North or South Pacific, Australian colonies, Indian or China seas, Mauritius, West Indies, British North America, or states of America, until the ship returns to a final port of discharge on the continent of Europe or the United Kingdom, with liberty to call at any port for orders. Probable period of engagement, twelve months."

The vessel arrived at Buenos Ayres on May 28, and left there in ballast, about July 13, for this port, where she arrived on October 20. A short time out from Buenos Ayres, the master put Stewart, who shipped and served up to that time as cook and steward, in irons for three hours, and then disrated him and put him before the mast, upon a charge of wasting provisions. From thenceforth Steward was made to do sail-

or's duty on deck and aloft, besides being often selected to do drudgery and disagreeable or unnecessary work about the ship, even, sometimes, when it was his watch below. He was not a seaman, and when aloft was subject to dizziness, on account of which his life was in danger.

Apart from the charge of "wasting the provisions," no complaint is made of his conduct either before or after being disrated. He has three certificates of discharge from service on British vessels since 1872, in which his capacity and character as "cook and steward" are marked "very good." His appearance upon the witness stand indicated that he is an intelligent, well-behaved and industrious man.

At this port, libellant demanded his discharge of the master, and being refused, he brought this suit for his discharge and wages. The evidence upon the charge of wasting the provisions in very meagre and unsatisfactory. The master carried the key of the locker, and was always present when the stores were weighed out. The log-book is not produced, and it does not appear that any entry of the transaction was ever made therein. I am inclined to the opinion, that the master, in putting libellant in irons and disrating him, acted without sufficient cause, and that in sending him before the mast, and treating him as he afterwards did, he acted harshly, if not cruelly.

But admitting that libellant was properly disrated, I think he is entitled to his discharge. By disrating him, the master abrogated the contract to serve as cook and steward, as far as he is concerned. This contract being thus terminated, the master ought not to be allowed to hold the libellant to other service against his will. True, if the libellant desires it, he may be bound to keep him on board, and return him to the final port of discharge; and in such case he might lawfully require libellant to do such duty on the vessel as would be reasonable under the circumstances. But where the person disrated is unwilling to longer remain on board, I do not think the master has any power to compel him to remain, and serve in a capacity totally different from that in which he engaged. The master, so far as appears, not intending to restore him to his position as cook and steward, the libellant is entitled to his discharge. No authority has been cited upon this question, but this conclusion seems to follow from the application of general principles to the case.

As to the question of wages, I am not clear that the libellant is entitled, under the circumstances, to recover according to the rate stipulated in the shipping articles—four pounds five shillings per month. Deducting one month's advance, and from the remainder one-third of the same, will leave about ninety dollars, for which sum the libellant must have a decree.

Crawford, Brown and Griffith, as appears

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

from their testimony and the shipping articles, are minors. On this ground they now avoid this contract, and seek their discharge. This is a voidable contract, and may, therefore, be avoided by these minors at their pleasure. Having elected to avoid it, it is abrogated, and the master has no longer any authority over them or demand upon them by reason of it. The result is they are discharged. The law of both Great Britain and the United States allows an infant the personal privilege of avoiding such a contract at any stage of the voyage, and the owners must be supposed to have contracted with him on this basis. They were to be bound, but the infants were at liberty to avoid the agreement. 1 Pars. Cont. (3d. Ed.) 262; Vent v. Osgood, 19 Pick. 572; Nickerson v. Easton, 12 Pick. 110; Moses v. Stevens, 2 Pick. 334.

Upon avoiding the contract, the minor cannot sue upon it, but is entitled to recover a reasonable compensation for his services, as though no such contract had been made. Medbury v. Watrous, 7 Hill, 111; Moses v. Stevens, supra. In ascertaining the value of libellants' services, a deduction must be made for any injury which the owners will suffer by reason of the sudden termination of the contract. Pars. Cont. 263, n. f.; Moses v. Stevens, supra.

Crawford shipped as an able-bodied seaman for the wages of three pounds ten shillings per month. Griffith and Brown shipped as ordinary seamen, the former for the wages of three pounds, and the latter two pounds per month. It appears that the bark is loading with wheat for a port in the United Kingdom. The wages out of this port for such a voyage, for able-bodied seamen is from thirty dollars to forty dollars per month, and for ordinary seamen twenty dollars to thirty dollars. Allowing the vessel five months to return in, the owners will have to pay to persons employed to take the place of these libellants, in addition to the wages paid them, a sum equal to one hundred per centum of such wages for that period. So far they are directly injured by the avoidance of this contract under the circumstances stated.

Deduct, then, this sum from each of the libellants' wages for seven and one-half months, and also the one month advance, and the remainder is the amount for which they are entitled to recover. [According to this, Crawford is entitled to $70, Griffith $60, and Brown $40.][2]

It is objected on the part of the claimant, that this court ought to decline jurisdiction of a suit by a seaman against a foreign vessel, unless it be a case of hardship. Not admitting, but that this court, in time of peace, ought to take jurisdiction of any suit brought by a seaman against a foreign vessel, except where otherwise provided by

treaty, and referring to what this court said upon this subject in The Hermine [Case No. 6,409], it is sufficient in this case to state the fact, that unless this court takes jurisdiction of this libel, there will be a failure of justice. By avoiding their contracts, as they lawfully might do, these minors became separated from the vessel in a foreign port, and if not allowed to maintain a suit in this court against her, for the compensation for which they may be entitled, they will be without remedy.

Freund and McFarlane, as well as Stewart, Brown and Crawford, also claim that they were discharged on the morning of October 29, because the mate, having, by the previous direction of the master, ordered them to go on the wharf and truck sacks of wheat to the vessel, and they having refused, on the ground that such work was not ship's duty, said to them, with many opprobious and obscene epithets, "Don't want you any more, go below," and ordered the cook not to give them any breakfast. A few minutes after this scene, the master came out of the cabin, the mate in the mean time having told him what had occurred, and went ashore. The men saw him go off, but nothing passed between them. The men went ashore in the course of an hour and met the master, who asked them what was the matter. They gave him their account of the transaction, and said the mate had knocked them off, and they had come ashore to get their breakfasts and a place to stay. The master replied that the mate had no authority to knock them off, to go back on ship-board, and they should be fed, whether they worked or not. The men declined to go, and seemed to think they were then at liberty to do as they pleased about the matter. The master then asked them to go with him to the British consul. They replied as if they might meet him there, but did not. On the following Friday evening they went aboard and got their chests and left the vessel.

By the custom of this port seamen are not required to lade the vessel. Unless, then, the libellants have expressly agreed to lade the vessel, the order to truck wheat was unlawful. But the simple order did not discharge the men nor justify their leaving the ship. If they were willing to assist the stevedore, so as to speed the lading and departure of the ship, they might do so, and if not, there was no harm done in asking them. Neither is it at all clear that the mate intended to knock the men off. The direction to "go below"—into the forecastle—was a lawful one, and may have been intended and understood in connection with what preceded it, as a declaration—if you won't truck wheat, there is nothing else for you to do, go below.

But be this as it may, the mate had no power to discharge the libellants, and if he attempted to do so, instead of clutching at

the circumstance as an excuse to leave the vessel and recover their wages, they should have appealed to the master the first opportunity. In any case, after meeting the master on the shore and being informed by him that the mate had no authority to knock them off, and being directed by him to return on board, with the assurance that they should have their meals and need not work, they ought to have returned to duty at once.

Their refusal to do this, taken in connection with all the circumstances of the case, indicates that the libellants were seeking an excuse to leave the vessel, with the law on their side, so that they could recover their wages for the outward voyage, and be discharged in a port where wages are much higher than the final port of discharge to which the vessel was bound.

For the reason suggested, the libellants were not discharged by the action of the mate on the occasion in question, and therefore they are not entitled to recover anything for their services. Unless this contract is substantially violated by the master, no wages are due upon it to the seamen, until the final completion of the voyage. In some respects the mate's conduct was very reprehensible and his testimony equally unsatisfactory. If the libellants, after time for reflection, had gone back to the ship and proffered to return to duty, and been refused, in a suit for wages the court would have probably excused their temporary absence, although a legal desertion, on account of the mate's conduct towards them in the first instance. But being, as I suppose, desirous to quit the ship, and at the same time thinking they had a technical advantage by which they might recover their wages, notwithstanding the non-completion of the voyage, they refused to return to duty even when informed by the master that the mate had no authority to knock them off, and that they would not be required to handle cargo. It turns out that they were mistaken in their scheme, and must lose the wages earned unless they return to duty and complete their contract.

It is also insisted by counsel for libellants that the barque will not be able to reach a port in Europe or the United Kingdom within a period of twelve months from the date of leaving Glasgow, and that therefore the sailing to this port was a substantial deviation from the voyage described in the articles, on account of which all the libellants are entitled to be discharged and recover the wages earned up to this time.

These articles were executed under section 149 of "the merchants' shipping act, 1854" (17 & 18 Vict. c. 104), which provides that the articles, among other things, shall contain "the following particulars as terms thereof: (1.) The nature, and as far as practicable, the duration of the intended voyage or engagement."

Of course it was impracticable to state the exact duration of the voyage contemplated in these articles. Therefore it was sufficient to approximate to it. Accordingly it was not agreed that the voyage should not extend beyond or fall within twelve months, but only that its duration would probably be twelve months. From Buenos Ayres, the master was at liberty to go to a port or ports in any of the countries or divisions of the globe mentioned in the articles, but only to one of them. This option he has exercised in coming to this port. From here he is bound to proceed directly and with all convenient dispatch to a port of final discharge in Europe or the United Kingdom. If in so doing, more than twelve months are consumed, it is a part of the engagement of the libellants that they will remain by the vessel. They have contracted to serve for the voyage absolutely, and for the necessary time to make it in, be it more or less than twelve months.

Of course, if the voyage was negligently or wantonly delayed for any considerable period over twelve months [say, six months],[3] the engagement of the libellants would be at an end, whether the voyage was or not. The implied undertaking of the master is that there will be an honest and intelligent effort to make the voyage within the time mentioned. If this is done, the libellants took the risk of all unavoidable delay when they contracted for the voyage.

Certainly, it must have been expected by libellants, when they signed these articles that the length of the voyage might be at least two months over or under twelve months. Subject to this contingency, at least, they made this agreement. It is quite certain that the Hotspur will complete her voyage inside of fourteen months. This calculation allows six and a half months for the return trip. But it is also probable—and that is all the certainty the articles require—that she will make it inside of the twelve months.

[Let a decree be entered for Stewart for $90, for Crawford for $70, for Griffith for $60 and for Brown for $40, with costs of suit; and as this calculation is made upon a gold basis, let ten per cent. be added to these amounts, upon the supposition that the decree will be satisfied with currency; and as to Freund and McFarlane that the libel be dismissed with costs to the claimant.][3]